

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 8, 2022

<u>**VIA ECF**</u>

Hon. P. Kevin Castel
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:   <u>United States v. Richard Banca</u>, 20 Cr. 163 (PKC)

Dear Judge Castel:

Richard Banca ("Banca" or the "defendant"), was a prominent racehorse trainer whose success was founded on fraud and deceit. Banca's racing program—which he built and helmed—was predicated on a scheme to obtain and administer illegal, unsafe, and unapproved performance enhancing drugs ("PEDs") to racehorses under his control. Banca orchestrated this deceit in service of greed, namely, to increase the odds that his horses would win races, thus earning him greater fees and income. Banca's efforts to corrupt were profound, as reflected in the parties' stipulated Guidelines calculation, which reflect earnings by Banca-trained horses of an amount between $9.5 million and $25 million. *See* Presentence Investigation Report ("PSR") ¶ 5. Banca accomplished that fraud by obtaining and abusing drugs from multiple sources. In light of the scope and longevity of the offense conduct, and the dangerousness the conduct posed to the animals subject to Banca's doping, the parties' stipulated Guidelines sentence of 36 months is the appropriate sentence in this case.

I.   <u>**Offense Conduct**</u>

The defendant engaged in a fraud scheme driven by his desire to corruptly collect prize money from racetracks, all while misleading and lying to various federal and state authorities, racetrack officials, owners, and competitors in an effort to avoid detection and interdiction of his offense conduct. The only way to successfully perpetuate this crime and avoid getting caught was to engage in multiple layers of deception, as demonstrated by this defendant's efforts to obscure his criminal acts.

The defendant obtained adulterated and misbranded drugs produced and sold by co-defendant Louis Grasso, a veterinarian. Those drugs included pain blockers, bronchodilators to improve a horse's breathing during a race, and other drugs designed to enhance a horse's race performance. *See* PSR ¶ 14. In all cases, the drugs Grasso sold to the defendant and those who worked under him were prohibited under New York racing rules. The defendant not only purchased custom-made products from Grasso, he also paid Grasso to write false prescriptions for

Epogen. PSR ¶¶ 17, 19. Those false prescriptions were issued to a pet horse named "Trymysocks," and in the name of a third party who disclaimed any knowledge of the prescriptions when questioned by law enforcement. *See* Exhibit A. These layers of deceit were necessary to obscure the defendant's receipt and use of these prescription drugs. The defendant obtained hundreds of prescriptions and prescription refills for Epogen, sometimes receiving multiple prescriptions with multiple refill orders in the span of one month, all in the name of the same horse. *See, e.g., id.* at 1 (prescriptions and refills obtained on September 2, 2015 (10 refills), September 8, 2015 (10 refills), September 14, 2015 (9 refills), September 21, 2015 (9 refills), September 28, 2015 (8 refills). By doing so, the defendant created a paper trail of false records making it appear that hundreds of doses of a potent PED were: 1) legitimately prescribed; 2) obtained by a client other than Banca; and 3) intended to be administered to a single pet horse, "Trymysocks." That deception enabled Banca to indiscriminately administer this potent blood builder to his horses.

Grasso, however, was not the sole supplier of the defendant's adulterated and misbranded drugs. As elicited from the defendant's assistant trainer Conor Flynn, whom the defendant supervised during the course of his offense conduct, and who testified at the trial of Lisa Giannelli in the related case *United States v. Navarro et al.*, 20 Cr. 160 (MKV), the defendant purchased adulterated and misbranded drugs from convicted defendant Giannelli, who likewise sold adulterated and misbranded drugs targeted to racehorse trainers. *See* Exhibit B (excerpts of Conor Flynn trial testimony). Giannelli was not a veterinarian. Banca nonetheless routinely purchased from her a variety of drugs, including prescription drugs issued with no valid prescription, among others. *See generally id.*

## II.   **Procedural History**

On February 26, 2020, the defendant was charged by Complaint with engaging in a conspiracy to manufacture, distribute, administer, and/or receive adulterated and misbranded PEDs intended for use on racehorses, and to secretly administer those PEDs to racehorses under scheme participants' control, with the intent to mislead and defraud various people and entities, including federal and state drug and horse racing regulators.  ECF No. 1. On September 29, 2020, Banca was indicted on that same count in the Superseding "S1" Information. ECF No. 57.

On April 19, 2022, the defendant appeared before Your Honor and pleaded guilty, pursuant to a plea agreement, to a Superseding Information, charging Banca with one count of substantive drug misbranding and adulteration with intent to defraud and mislead, in violation of Title 21, United States Code, Sections 331 and 333. PSR ¶¶ 2, 4. Banca's change of plea followed this Court's denial of the defendants' pre-trial motion to dismiss, to suppress the wiretaps and its derivative fruits, to compel discovery, and for a bill of particulars. *See* ECF Nos. 127, 128, 131, 132.

Under the terms of the parties' plea agreement, Banca stipulated to the following: the loss amount was between $9.5 million and $25 million, a figure that was derived from the purse winnings won by Banca-trained horses during the time period of the offense conduct; the offense involved 10 or more victims, specifically, the racetracks that made payments under false pretenses based on Banca's doped horses' race performance; that the defendant was an organizer, leader, manager, or supervisor as the head of his racing stable; and the defendant abused a position of

public and private trust by abdicating his duties as a state-licensed racehorse trainer. PSR ¶ 5. As reflected in the parties' plea agreement, the ultimate Guidelines range is adjusted to the statutory maximum sentence of 36 months' imprisonment.

## III.   Defendant's Sentencing Submission

The defendant's eve of sentencing recalculation of what he believes to be the applicable loss amount should be disregarded entirely as a violation of the parties' plea agreement, in which the defendant specifically stipulated to the loss calculation relevant to his plea. *See* Def. Sent. Subm. at 2.[1] As a prudential matter, the defendant is responsible for the entirety of the purse winnings earned by horses he trained, whether or not he personally pocketed the funds or passed the funds to a third party or co-conspirator. That Banca owned some of the horses he raced, and thereby kept the majority of the prize winnings those horses earned, further undercuts his eve of sentencing back-of-the-envelope recalculation. The loss amount outlined in the plea agreement and set forth in the PSR was derived from the total purse winnings Banca's horses earned based on their race performance. The sheer volume of purse winnings earned as a result of the offense conduct demonstrates that the defendant's doping operation was prolific. The defendant's attempts to challenge facts to which he already admitted undercuts the defendant's contention that he has "fully and completely accepted responsibility." Def. Sent. Subm. at 4.

Further, the defendant seeks credit for the timing of his guilty plea and his early payment of forfeiture, immediately upon entering his guilty plea. *See generally* Def. Sent. Subm. The Government notes that the defendant pleaded guilty after the denial of his and other defendants' dispositive motions, and approximately two years after he was initially charged. The defendant did, however, timely satisfy the entirety of his forfeiture obligation. That fact inures to his benefit. Nevertheless, that factor does not mitigate the necessity for a Guidelines Sentence of 36 months' imprisonment.

## IV.   Sentencing Factors

### a.   Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. 220, 264 (2005).  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines

---

[1] By contesting the calculation of the applicable loss amount, Banca is in blatant breach of the terms of the parties' plea agreement. Despite agreeing to the calculation set forth above in the parties' plea agreement, and despite further agreeing that "neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein," the defendant invites the Court to reconsider the parties' stipulation as to the applicable offense level on the basis of his recalculation of what he wishes applied. This Court should reject any entreaty by the defendant to reconsider the agreed-upon loss amount as set forth in the PSR, or to mitigate the defendant's sentencing on the basis of his representations as to the loss.

range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### b. Discussion

The 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate general and specific deterrence.  A Guidelines sentence of 36 months' imprisonment is the appropriate sentence – one sufficient but not greater than necessary to serve the purposes of sentencing when balancing the defendant's acceptance of responsibility, his culpability relative to other defendants, the abuse he exhibited as a licensed racehorse trainer with direct and unconstrained access to racehorses, and use of potent PEDs.

First, it is not the case that the defendant's crime was the result of a single lapse in judgment, confined in time and scope. The defendant engaged in a years-long, sophisticated, and lucrative scheme to corruptly win horse races. Until his arrest, Banca earned his livelihood through his "doping program," which touched all the horses under his care and control. And that doping program carried serious risks to the health of the horses under his care. Banca's claim that his horses did not "suffer any injury" as a result of his doping is simply incorrect. *See* Def. Sent. Subm. at 4. Notably, two horses trained by the defendant suffered injuries and were euthanized or otherwise died at the track or during a race, in 2018 and 2016, respectively. *See* Equine Death and Breakdown, State of New York, *available at* https://data.ny.gov/widgets/q6ts-kwhk (last accessed Sept. 8, 2022). Horses as a matter of course are aware of their bodies' limits and would not, of their own volition, race to the point of a catastrophic breakdown requiring euthanasia. Banca's doping program compelled horses to race past their limits by, thus risking their health and welfare.

This principle applies equally to horses under Banca's care who were not euthanized, but who were nonetheless subject to a regimen of medically unnecessary and unapproved drugs. The prohibited and, in some cases, unlabeled, untested, unstable, *injectable* drugs that Banca used as part of his doping program inherently risked the health of the horses that were receiving drugs designed to amplify their race performance. The defendant purchased these drugs from multiple sources and used them without regard to the actual content or likely long-term effects of those drugs in the body of the horses under his control.

In particular, and as set forth above, the defendant obtained scores of the blood builder drug Epogen using false prescriptions. Epogen, an erythropoietin, is one of the most potent performance-enhancing substance used by trainers to boost the red blood cell count of a horse in order to stimulate the horse's endurance, which in turn enhances that horse's recovery from a race and performance during a race. Its potency is reflected in the model rules of the Association of Racing Commissioners International ("ARCI"), which have been adopted by numerous jurisdictions, and which classify erythropoietin stimulating substances and their analogues as "Class 1" drugs, namely, "drugs that have the highest potential to affect performance and that have no generally accepted medical use in the racing horse." *See* Uniform Classification Guidelines for Foreign Substances And Recommended Penalties Model Rule, January 2020, *available at* https://www.arci.com/wp-content/uploads/2020/01/ARCI-CLASSIFICATION-PROGRAM-v14.1.pdf. That drug is in the same class as opiates, amphetamine-like drugs, synthetic opioids, psychoactive drugs, and all DEA Schedule 1 drugs. *Id.* Further, the use of Epogen in a horse would result in immediate disqualification of a racehorse from a race, and additional penalties and consequences to the licensed trainer. *See* 9 NYCRR § 4043.6; N.J. Admin. Code 13:70-14A.13. The defendant and his co-conspirators obtained these drugs through fraud, and used them for the purpose of committing fraud. And he did so for an extended period of time. Because there was no reason for this course of conduct other than to force racehorses to perform beyond their natural abilities, Banca was, indeed, involved in the abuse of his animals for money.  The defendant's efforts to obscure his conduct are significant because they indicate that the defendant knew precisely that his conduct was illicit, and took extensive and varied measures to make his crime difficult to detect.  Indeed, for years and until this prosecution, the defendant's actions worked. The offense was grave, the drugs used were potent, and a Guidelines Sentence is warranted as a result.

Moreover, a Guidelines sentence is necessary to afford adequate general deterrence.  *See* 18 U.S.C. § 3553(a)(2)(B).  Racehorse trainers, who are entrusted with the care and custody of racehorses, have unfettered access to these animals, and by extension are entrusted to ensure those horses' care and health. Like veterinarians, trainers are afforded a certain latitude under the assumption that they are acting in good faith as competitors and as custodians of racehorses. The defendant exploited that good faith. Banca, like all too many actors in the racehorse industry, had grown indifferent to, and dismissive of, the notion of obtaining illegal drugs to dope racehorses for profit. Racehorse trainers, in particular, assume that even if caught doping, they will have the means and wherewithal to obfuscate, litigate, and intimidate others into overlooking or justifying a violation, and thus continue their doping practices unencumbered. A Guidelines sentence of 36 months' imprisonment will send a strong signal to racehorse trainers and others in the industry that there will be serious consequences if they abuse their position of trust by engaging in the callous and dangerous practice of doping racehorses for profit. A Guidelines Sentence will serve to counter

the pervasive view in the racehorse industry that administering PEDs is inconsequential and that such criminal activity will never amount to significant criminal penalties.

Further, a Guidelines Sentence for this defendant would avoid disparities with other, similarly-situated defendants who have pleaded guilty to similar charges and engaged in similar conduct, arising out of the related prosecution *United States v. Navarro et al.*, 20 Cr. 160 (MKV). In particular, the following racehorse trainers have pleaded guilty to the same substantive offense conduct and received terms of imprisonment at or approaching the 36-month statutory maximum sentence. *See United States v. Zulueta*, 20 Cr. 160 (MKV) (ECF No. 791) (trainer-defendant's Guidelines Range of 30 to 36 months' imprisonment based on loss amount between $550,000 and $1.5 million; Zulueta sentenced to 33 months' imprisonment); *United States v. Christopher Oakes*, 20 Cr. 160 (MKV) (ECF No. 799) (Guidelines Range of 46 to 57 months' imprisonment based on loss amount of $1.5 to $3.5 million automatically adjusted to Guidelines Sentence of 36 months' imprisonment; Oakes sentenced to 36 months' imprisonment). Another trainer-defendant who pleaded guilty to a conspiracy pursuant to 18 U.S.C. § 371 likewise received a statutory maximum sentence. *See United States v. Navarro*, 20 Cr. 160 (MKV) (ECF No. 608) (trainer-defendant's Guidelines Range of 168 to 210 months' imprisonment based on loss amount of $25 to $65 million automatically adjusted to Guidelines Sentence of 60 months' imprisonment; Navarro sentenced to 60 months' imprisonment).

The defendant's reliance on the Government's sentencing recommendation in *United States v. Garofalo*, 120 Cr. 162 (JPO), is not an apt comparison for this defendant for a number of reasons. First, as argued above, Banca was a racehorse trainer with a duty of responsibility to the horses he trained, and a commensurate duty to the racing commissions who licensed him and the racetracks who rewarded him. Banca directly abdicated that duty by engaging in the offense conduct. That duty was not held by Carl Garofalo, who was not licensed as a pharmacist or racehorse trainer, and had no access to horses. Second, Garofalo and others in that case demonstrated that the drugs they were selling via their direct-to-consumer website were purchased by veterinarians, animal shelters, and other parties who were not involved in the racehorse industry. While the Government disagreed on the extent, import, and basis of those assertions, that argument factored into the Court's sentencing determination for both him and his co-conspirators. There is no comparable mitigating factor for Banca, who was a racehorse trainer obtaining drugs to dope his racehorses to perpetuate a fraud. Third, Garofalo and others in that case further argued that the vast majority of their sales revenue derived from sales of an oral omeprazole paste, which had little performance-enhancing value. Again, although the Government disputed the extent, scope, and basis of that proof, and the implications to be drawn therefrom, that fact likewise influenced the Court's determination. Finally, and significantly, Garofalo was the third defendant to be sentenced in that case. He was sentenced after co-defendants Scott Robinson and Scott Mangini each received sentences of 18 months' imprisonment. *United States v. Robinson et al.*, 120 Cr. 162 (JPO) (ECF Nos. 63, 121, 141). As to both Robinson and Mangini, the Government advocated for the statutory maximum sentence of 60 months' imprisonment. *Id.* (ECF Nos. 59, 115). The Government's recommendation for a sentence to a substantial term of imprisonment for Garofalo was thus directly informed by the 18-month sentence imposed on Mangini, a direct co-conspirator and indisputably the more culpable of the two. The same considerations plainly do not apply here.

V.   **<u>Conclusion</u>**

The Government respectfully submits that the stipulated Guidelines sentence of 36 months' imprisonment is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by:  <u>/s/Sarah Mortazavi</u>
Sarah Mortazavi
Assistant United States Attorney
252-637-2520

cc: David Louis Cohen, Esq. (by ECF)